542          COURT OF APPEALS OF WEST VIRGINIA.

Aug. Term,     Wh. Sulp. Spr. Co. *vs.* Robinson, sheriff, *et al.*          1869.

## 𝔚𝔥𝔢𝔢𝔩𝔦𝔫𝔤.

WHITE SULPHUR SPRINGS CO. *vs.* WALLACE ROBINSON, SHERIFF, *et al.*

August Term, 1869.

1. It is not a valid objection to an order dissolving an injunction, that no notice of the motion to dissolve was given, when the motion was made in court, if there was no equity in the bill. Nor is there error in dissolving, under like circumstances, without an answer.

2. It is not the province of a court of equity to relieve a peculiar property, (as a watering place for the resort of visitors) where it is greatly depreciated in value by causes resulting from the rebellion and the state of the country after the suppression of the same, from taxes charged thereon according to the value of the property prior to the rebellion. Such a consideration might be very appropriately addressed to the legislative department of the government.

A bill of injunction was obtained by the White Sulphur Springs Company from the circuit court of Greenbrier county, against the sheriff and board of supervisors of that county to restrain the former from collecting taxes assessed on the property of the company for the years 1865–6–7. The burden of the complaint was that the property was assessed upon the valuation of 1860, and in consequence of the depreciation of the value of the property of the company, which was used as a watering place for the resort of visitors, during those years, succeeding the suppression of the rebellion, the same was not profitable nor remunerative, and could only be used for agricultural purposes, and ought to be so valued and assessed with taxes.

The injunction was dissolved without answer or notice.

The statutes pertaining to the assessment of property are referred to by the president in his opinion.

The complainant appealed to this court.

*J. W. Davis* for the appellees.

BROWN, President.    The bill charges that the White Sulphur Springs property was assessed with the taxes for the years 1865–6–7, upon the assessment or valuation of 1860, when the said property was much more valuable and far more profitable than it has ever been since that year.

It further charges that the assessment for those years was made upon said property as a watering place, when it was only taxable for said years as an agricultural property, inasmuch as the condition of the country during those years was such as to render it impossible for said property to be kept as a watering place.

The injunction that had been granted to restrain the sheriff from collecting the said taxes was dissolved without answer and without notice.

There is nothing in the objection for want of notice, as the motion to dissolve was made in court, if there was no equity in the bill.    *Hyre* vs. *Hoover*, 3 W. Va., 11.    And the record shows the case was argued by counsel on the hearing.    Nor was there error in dissolving without answer, if there was no equity in the bill; *ubi supra.*    The material question then recurs, was there equity in the bill?

Article 8, sec. 1, of the constitution declares that "taxation shall be equal and uniform throughout the State, and all property, both real and personal, shall be taxed in proportion to its value, to be ascertained as directed by law. No one species of property from which a tax may be collected shall be taxed higher than any other species of property of equal value," &c.    In 1839–40 there was a general assessment and re-valuation of the lands of the State of Virginia for the purpose of taxation and equalization, made under an act of the legislature.    In 1850, there was another assessment of like character and for like purpose, and un-

der like authority, and again another in 1856, and again another in 1866-7, in the State of West Virginia.

The last named assessment was made under the act of February 21, 1866, and by joint resolution of February 27, 1867, was not to be made the basis of taxation till 1868. So that for the years 1865-6-7 and all the other years from 1856 to 1868 (except so far as certain counties among which Greenbrier was included, were released from taxes from 1861 to 1864, inclusive), the basis of taxation was the general assessment made under the act of March 27th, 1856. That act provided for the re-assessment of the land throughout the commonwealth. It provided for the appointment of assessors who were to proceed immediately to examine all the lands and lots with their improvements thereon, within their respective counties, and upon such examination to ascertain and assess the cash value thereof.

It further provided that any person feeling himself aggrieved by the assessment of his lands or lots, upon giving notice to the assessor might apply to the court of his county, at the first, second or third term after such assessment, and not after, to have the same corrected.

By chapter 35 of the Code of 1860, the duties of commissioners of the revenue are prescribed, who are now substituted by the assessors by the provisions of the act of December 3d, 1863.

It is nowhere, in any of the general laws, made the duty of the assessor to change or diminish the valuation of lands from the general assessment last preceeding.

The assessor shall enter lands omitted, and assess their value by the assessed value of contiguous lands. He shall note the changes by deaths, grants, devises, &c., and make the entries on the land books conform to the changes and respective owners, &c. He shall assess the value of omitted buildings and new buildings not before assessed, and also buildings increased in value by repairs, where, in each case, the value is 100 dollars or upwards. And by the 34th section of the act of 1863, " When from natural decay, or other causes, any building which may

have been assessed shall be either wholly destroyed or reduced in value below 100 dollars, the assessor shall deduct from the assessment against the owner the value at which such building may have been assessed."

If the depreciation of the property in question was within the purview of this section, that is if the buildings thereon were destroyed or reduced in value below 100 dollars, from natural decay, or other cause, it was competent for the assessor to have made the correction, and it was also his duty under the penalty prescribed by the act for the failure. By the 30th section of said act the assessor is required to take with him the land book of the preceeding year, and the entry of land charged to any person resident or having an agent in his district, to be shown to such person, or his agent, who shall be required to state on oath whether the same be correctly entered, &c.   And by the 77th section of the act it is provided, "If in any case in which in consequence of there being no assessor for a former year, or, from any cause, no book was made out of the land tax or tax on personal property, or those subject to levy in any district for that year, the assessor for such district shall proceed to make out books for such year according to the rate of tax or levy which then existed, as well as books for the current year.   The like proceedings shall be had with and under the books of such former year as with those of the current year, and the sums therein charged shall be collected and accounted for in like manner."

By the 81st section it is made "the duty of the assessor who may first exercise the duties of his office within any district under the provisions of this act, to make out a land book embracing all the lands and town lots within such district, compiled from the land books delivered to him by his predecessor, and from such other sources of information as may be within his reach," &c.

A copy of this land book is to be delivered to the clerk of the board of supervisors to be preserved among the records of his office for the inspection of any person, and a like copy is to be delivered to the sheriff, and is made his guide in col-

lecting the taxes assessed therein, and a like copy transmitted to the auditor to guide him in settling with the sheriff.

After the assessor has verified and delivered the copies of the land book no alteration can be made therein by him affecting the taxes of that year. But any person aggrieved by any entry therein, may, within one year after the date of the verification, apply, by petition, for relief to the board of supervisors of the county. And if the board be satisfied that the applicant is erroneously charged on such book it shall certify the facts upon which it grants relief, and shall order that he be exonerated from payment of so much as is erroneously charged, if not already paid, and if paid, that it be refunded to him.

If, therefore, the relief sought came within the provisions of the statute thus stated, the mode was there prescribed in which it was to be obtained, and if neglected it could not be found in a court of chancery.

But it is manifest that the relief sought is not that contemplated in the 34th section before recited, and is not, therefore, within the jurisdiction of the board of supervisors as provided by sections 100 and 101 of said act. The complaint is not that the property in question was improperly or erroneously charged with taxes for the years 1865–6–7, but that the tax assessed was upon the valuation of 1860, instead of upon the depreciated value of the property at the time, viz: 1865–6–7, resulting from the state and condition of the country then just emerging from a state of civil war and the peculiar business to which the property had been appropriated, as a watering place and resort for visitors at a particular season.

The complaint is in substance nothing more nor less than that the great depreciation in the value of a peculiar property, resulting from the state and condition of the country during a civil war, should be relieved against in a court of equity by a corresponding reduction of the taxes charged thereon. Such a consideration addressed to the discretion of the legislature might be very appropriate and relieved against, as was done in the case referred to, of the taxes released alto-

gether in several counties, including the county of Greenbrier, •from 1861 to 1864, inclusive. But beyond the relief which the legislative department may choose to accord or prescribe, the fortunes of war must be left to rest where they fall. It is one of the evils of war that its misfortunes do not always fall alone on the guilty parties, but involves alike the innocent and the helpless. And it is not perceived how, in the absence of any express provision of the legislature, or rule to guide in the investigation and determination of a question like the present, a court of equity could assume to adjust the evils of inequalities and misfortunes produced by such a state of things.

This court has at the present term, in the case of *Caperton* vs. *Landcraft*, withheld its aid to stay a sale of land under a trust deed, where the ground for delay was depreciation in value and the prospect of ruinous sacrifice on account of the same state of things.

If the complainant has any remedy, other than a resort to the legislative department, it would seem to be under the 105th section of the act of 1863, upon application to the auditor. But whether the case comes within the purview of the statute it is not necessary here to decide, since it is clear that it is not one over which this court, in the form presented, has jurisdiction to give the relief asked.

I think, therefore, that there was no equity in the bill, and that the injunction was properly dissolved. The decree of the court should, therefore, be confirmed with costs to the appellee and damages.

The other judges concurred.

DECREE AFFIRMED.